*Rand,* for defendant.

*Shepley & Dana,* for plaintiffs.

---

## HULL, *in Equity, versus* NOBLE *& al.*

An agreement in writing to sell certain tracts of land, signed by each party thereto, *remaining in the hands of the vendor,* with a further agreement by him to *deliver* to the other a *duplicate,* on payment of a certain sum at a time fixed, is, on payment thereof according to the terms, in equity, valid, and on fulfillment of its conditions by the vendee, or an offer so to do, specific performance may be required.

After the payment is made to entitle the party to a *duplicate,* no demand of it is essential to vindicate his rights under it.

It is a reasonable excuse for not fulfilling the conditions of a sale of real estate, as to the *time* of payment, by the party seeking a specific performance, that the agreement was withheld from him by the other party, after he was entitled to its possession.

Of the notice of claims to real estate which will affect a *purchaser.*

BILL IN EQUITY, for the specific performance of a contract.

The bill set forth the following contract, signed by Noble, one of the defendants. —

"Boston, May 20, 1851.

"Upon the following conditions, I will sell Mr. Robert Hull, of Portland, by deed of quitclaim, all my right, title and interest in and to the following lots of land, as laid down on the plan of land or lots in Portland, west of Brackett's estate, recorded Cumberland Registry, Feb. 18, 1836, in the Plan Book No. 1, No. 10, in said book. The lots numbered on said plan 7, 8, 9, 10, 11, 12, 25, 26, 27, 28, 29, 30, also the lot 60 feet by 286, or thereabouts, being on Vaughan and X St. The same I purchased of Pain's estate, and two undivided thirds of the lots of land marked 35 and 37, being about 86 feet each by 200 feet, also two undivided third parts of four lots, about 20 feet, more or less, by 100, being southerly of, and adjoining lots Nos. 9, 10, 27, and 28, and lot No. 67, adjoining T. and W. streets 60 by 100 feet, his paying me for said land two thousand dollars, five hundred dollars in nine months, with interest from this date, and the taxes on said land within the ninety days, and pay the taxes yearly, hereafter, and the balance, being fifteen hundred dollars, in three years with interest, payable annually, to be secured by notes and mortgage of the premises. Now if the five hundred and interest is paid me on the 20th day of Feb., A. D. 1852, and he gives me the notes secured by a mortgage for $1500, payable in three years with interest, payable yearly, as the same fall due on or before said day; and if the said Hull shall well and truly perform, on his part, this agreement, and make the payments therein stipulated, to be made at the time and in the manner stated, I will give him the deed of quitclaim, as above provided for. Now upon the failure of said Hull to perform any part of the above agreement, or make the payments as provided for, then this obligation shall be void, and of no effect as against said Noble."

It was also alleged that the above agreement was signed by the orator, and remained in the keeping and possession of Noble, the orator having no copy of the same. But on

the same day, Noble delivered to him a writing, signed by himself, running thus : —

" If Robert Hull pays me forty-three dollars and thirty-three cents, with interest, within thirty days from this date, I will give him a duplicate bond of sundry lots of land, signed by him and me, this day."

The bill further alleges, that on June 14, 1851, the orator paid, at the counting room of Noble, to one Hall, his partner or clerk, the sum of $43,50, Noble being then absent from Boston, who gave a receipt therefor in his name, and which afterwards was paid by him to said Noble ; and then and there demanded the duplicate bond or agreement referred to in this last agreement, but could not obtain the same ; and that he frequently applied for it afterwards and stated his willingness and readiness to fulfill the same on his part, but said Noble neglected and refused to deliver it, and after the expiration of nine months from the date of said instrument, the said Noble claimed and pretended that this complainant had lost all rights under the same, because he had not made the first payment according to the terms of said agreement, although he was ready so to do, and was prevented solely by the acts of said Noble in wrongfully withholding it ; and that it was not until June 30, 1852, that he was enabled to see or read said instrument, or to become acquainted with the terms or dates of the payments provided for therein, at which time he called on said Noble and informed him he was ready to fulfill said agreement, and pay all that was required by the terms thereof, but said Noble refused to receive any payment, and insisted the same was cancelled and of no effect, and that this orator had no rights under the same ; but the said Noble then, for the first time, offered him a copy of said agreement, which he called a duplicate, which he refused to accept, because said Noble declared the same was void, fearing that it might be construed into an admission that the statements made by said Noble were true.

It was further alleged, that after consulting counsel, the

plaintiff. concluded to receive said paper, but could not find Noble, and then requested his counsel to apply to the counsel of Noble for it, and that they obtained it on July 24, 1852. That on July 30, of that year, he tendered to the counsel of said Noble $500, with the interest thereon, together with his note for $1500, with a mortgage on the land described in said agreement to secure its payment, and requested the counsel to notify said Noble. That on Aug. 2, of that year, he dispatched a person with the money, note and mortgage to Boston to make the tender to said Noble in person, but he was absent at Philadelphia, and was unable to make the tender. That on Sept. 10, 1852, thinking Noble would be at home, he sent again, but was unable to find him, and then such tender was made at his counting room.

The bill also set forth that plaintiff, at divers times, on account of said land, had paid said Noble large sums of money, and the taxes assessed on the same for many years past, and expended large sums in fencing and improving the same.

The bill also alleged, that said Noble, not regarding his said agreements, has refused, though thereto requested, and still refuses to convey said premises according to the terms of said agreement, but confederating with John B. Brown, the other defendant, has conveyed, or agreed to convey to said Brown, or entered into some written agreement with said Brown respecting the same, of the precise nature of which this complainant is not advised, and that when he entered into said agreement, or took the conveyance from said Noble, was well aware of the rights of plaintiff in the premises, and well knew he was in the open and peaceable possession of the same, that said Brown claims the occupation and possession of said premises, and some title thereto, of the precise nature of which the complainant is not advised.

The bill prayed for relief, for full answers under oath, and for a conveyance, &c.

The defendant Brown, in his answer stated, that long before the making of this bill, he bargained with Noble for certain lots of land in Portland, among which were lots numbered 7, 8, 9, 10, 11, 12, 25, 26, 27, 28, 29 and 30, mentioned in the bill, and in pursuance of said agreement, on April 30, 1852, Noble conveyed the same to him, and he entered upon and took possession thereof under his deed, which he made a part of his answer. He also denied any combination or confederacy with said Noble to deprive plaintiff of the benefit of his agreement, but was informed by said Noble, and he verily believed that the plaintiff had not any right to said lots or any interest in them. That although Noble did offer to show him certain old agreements and correspondence between Noble and plaintiff, he did not read the same, being told they were of no value or consequence; that he knew nothing of his own knowledge about any of the doings and negotiations in regard to said lots, between said Hull and Noble, nor believed the allegations in the bill to be true.

In the deed annexed to his answer, the consideration was inserted as $12000, but it was merely a quitclaim, without any covenant against persons claiming under the grantor.

Noble, in his answer, alleged that the land described was formerly owned by himself and two other persons, which in 1835, they sold to plaintiff at auction, on which the first payment was made, and he mortgaged the same to the grantor to secure the purchase money. This mortgage was foreclosed, and the estate forfeited. He purchased out his partners, and that all the money paid by plaintiff was paid prior to the foreclosure of that mortgage. That he then made a new contract with said Hull on June 10, 1849, which he failed to fulfill, and applied to respondent for an extension of it. And this respondent, although he believed the complainant would still be unable to make the stipulated payments, yielded to his urgent request, and made the agreement described in the bill, at the same time stating to him, that unless he punctually complied with the terms, he

should have no further accommodation. To this agreement was annexed the following, signed by plaintiff:—

"For a valuable consideration, I hereby agree to purchase the premises as within described, and make the payments as herein provided for, and give the notes and mortgage, and perform all the obligations as set forth in the paper signed by Joseph Noble above for me to perform."

He admitted the payment of $43,33, and averred his readiness and willingness to make and deliver a duplicate of said agreement, whenever said complainant should call upon him for the same at Boston, his place of residence and business, and where the original agreement was made, or should send for the same. And he denied, that plaintiff frequently, within nine months from May 20, 1851, at any place, applied to him in any way for a duplicate, or stated his readiness and willingness to perform his part thereof, or that he ever refused to make and deliver the same.

That he did not see or hear from plaintiff within nine months from May 20, 1851, except once, when about Nov. 1, 1851, he accidentally met him in Portland, and plaintiff asked him if he had the bond with him, when he made answer, that he had not, but that it was ready for him in Boston. That plaintiff did not then state his readiness to perform his part of the agreement, but on the contrary, always declared his inability, and at no time did he make any inquiry as to its terms, or at any time within the nine months aforesaid, pretend that he did not know the terms thereof.

The defendant Noble, further averred, that in June, 1852, at Portland, the plaintiff stated to him, that he had not been able before and could not then raise the amount required to make the cash payment named in said agreement; and then offered to pay $300, if he would wait eight months for the balance, which he refused, as he had before that sold and conveyed said lands to J. B. Brown. Whereupon the complainant, after said refusal of this defendant, for the first time, said he was ready to perform the conditions and stipu-

Hull *v.* Noble.

lations of said agreements, but made no tender of money, notes or mortgage, but afterwards, during the same interview, stated his inability, and requested an extension, which was refused.

The tenders mentioned in the bill were admitted for any thing known to the contrary. He also denied that any thing had been paid for said land under the last agreement or any prior agreement subsequent to the mortgage of 1835. That under the agreements and deed aforesaid, and notwithstanding plaintiff's repeated failures to comply with their terms, he had been permitted to occupy the premises and receive the rents and profits thereof, from the date of his deed, in 1835, to the time of said conveyance to Brown, without any account. And that after the time for making the payment and performing the other conditions of the agreement of May 20, 1851, by the complainant, had expired, and the complainant had wholly failed to comply with the same, this defendant, desirous of disposing of his land, received proposals from Brown, and conveyed to him these premises with sundry other lots. That he stated to Brown he had been advised by counsel, and verily believed that complainant had no interest in said lands, and no claim for a deed, &c.

The complainant introduced depositions tending to show that, in October or November, 1851, he demanded the duplicate bond of Noble, and offered to pay any thing due; and that about the first of October, of the same year, Noble was called upon, by one Furlong, to see if he would sell a couple of those lots, and that he said he could not, they were plaintiff's, if he paid the balance, but if he did not pay it, the land would belong to him, and he had promised it to J. B. Brown, and he should sell it to Brown, if to any one, and had agreed if he held the land, to deed it to him.

*Shepley & Dana,* for plaintiff.

By the payment of $43,33 to defendant Noble, the plaintiff had a right to the possession of a duplicate bond, and it became an operative, executed and delivered instrument, in force against both parties, and he had a right to a convey-

ance of the land upon the subsequent performance by him of the terms of the bond. This bond was, in Oct. or Nov., following, demanded, and according to the evidence, refused. Noble was then in default, and so remained until his power of performance was divested by his own act.

The complainant did not offer the payments at the exact time. He has a legal excuse, he did not know when the payment was to be made, and if he had known, he could withhold until defendant performed his duty.

In Oct. 1851, Noble was conspiring with Brown to work a forfeiture. Hull owed nothing then, nor would he until the February following. After the time had expired, he received, by his agent, money towards these premises.

Brown is chargeable with notice. He bargained in Nov., 1851, and was to have the property in case Hull did not pay. His deed is dated in the following April. It shows on its face that he knew Hull's rights, and that Noble knew he had rights. No covenants of any kind, and still a consideration of $12,000. This was not recorded till June 22, of the year following, after this bill was commenced. The answers of Brown and Noble admit sufficient knowledge to charge Brown with notice. If he did not read the papers, he had notice enough to put him on inquiry.

As to what amounts to notice, we cite *Carr* v. *Hilton*, 1 Curtis, 390, and to the effect of it. 2 Story's Eq. § 784.

Here the time of performance was not of the essence of the contract, and specific performance in such cases will be decreed. *Jones* v. *Robbins*, 29 Maine, 351. If it was, then we show the failure owing to the fault of the other party. *Rogers* v. *Saunders*, 16 Maine, 92. We might rely also upon a waiver of strict performance. *Longworth* v. *Taylor*, 14 Peters, 172; White & Tudor's Leading Cases in Equity, vol. 2, part 2, pp. 26, 29, 30, 33 and 36.

*Rand*, for defendant, Noble, contended that the agreement of May 20, 1851, was a conditional one, based upon conditions precedent, which were not complied with, or pre-

vented by Noble. Plaintiff was notified that no extension would be given.

That it was well settled that equity will not ordinarily relieve against the breach of a condition precedent.

That the agreement and the memorandum for a copy, were entirely independent matters, the neglect to furnish the duplicate was no excuse for non-compliance with the conditions; that it was not even alleged that plaintiff did not know the terms of the agreement.

That in the interview, in Nov. 1851, plaintiff admitted his inability, and did not pretend ignorance of the terms, and so also in June, 1852, when he offered $300, and wished an extension for the balance, which was refused; at the same time after this, admitted his inability; but this was the interview, when, according to a witness, plaintiff said he was ready to perform.

That under this agreement, not a cent had been paid towards the land; the sums paid, were merely for rent.

That plaintiff had never performed the stipulation as to taxes, and never offered to do so; and that the answer is to be taken as true, no attempt being made to disprove it.

*W. P. Fessenden,* for Brown, the other defendant.

TENNEY, J. — The complainant seeks a decree for specific performance of an agreement in writing, executed by him and the defendant Noble, on May 20, 1851. By that agreement, Noble contracted to give to the complainant a quitclaim deed of all his right, title and interest *in and to* certain lots of land, particularly described in the agreement, on the condition, that the complainant should pay therefor the sum of $2000; $500, of which was to be paid in nine months with interest from the date of the contract; the taxes upon the land within ninety days, and the taxes afterwards assessed, to be paid yearly, and the balance, being the sum of $1500, to be secured by notes and a mortgage of the land described in the contract, in three years, with interest, payable annually. Upon failure of the complainant to per-

form any part of the agreement, or make the payments as provided for, the obligation was to be void and of no effect against the defendant Noble. On the same 20th day of May, 1851, Noble delivered to the complainant a written agreement in the words and figures following, — " If Robert Hull pays me forty-three dollars and thirty-three cents with interest, within thirty days from this date, I will give him a duplicate bond for sundry lots of land, signed by him and me this day.                  Joseph Noble."

" Boston, May 20, 1851."

And the complainant alleges in his bill, that on June 14, 1851, he paid at Boston, in the counting room of said Noble, to one F. A. Hall, the partner or clerk of said Noble, the sum of $43,50, being the amount to be paid, with interest, Noble being absent at Philadelphia, as he was at the time informed and believed. And the complainant alleges, that he then and there demanded the duplicate bond or agreement, but could not obtain the same.

Noble admits in his answer, that the contract for the sale of the land, was not delivered to the complainant on the day of the execution of the agreement, for the reason, that the complainant had agreed to give him as a bonus or consideration therefor, the sum of $169, and not being prepared to pay the whole sum, the complainant gave to him, as a part thereof, a note dated May 12, 1851, for the sum of $56,70, signed by J. M. Kinsley, and indorsed by the complainant, and gave the written agreement of May 20, 1851, which has just been copied herein, and he admits that the sum of $43,33, and interest, was paid by the complainant, as alleged in his bill; and that the note signed by Kinsley and indorsed by the complainant was paid by the latter. And it is proved by other evidence, that the indorser being called upon, paid the note on April 23, 1852, and the money was received by the defendant Noble.

It is also admitted in the answer, that in November, 1851, on a meeting of the complainant with Noble in Portland, the latter inquired of the former, if he had the bond with

him, and Noble replied that he had not, but that it was ready for him in Boston.

It is averred in the bill, that June 30, 1852, was the first time, after the execution of the contract, that the complainant had opportunity to see or read the agreement of May 20, 1851, or to become acquainted with its terms or the dates of the payments provided for therein; at which time Noble insisted, that the same was cancelled and of no effect, and denied that the complainant had any rights under the same, and declared that he would receive no payments on account thereof, but at the same time offered to him what he supposed was a copy of the agreement, but the complainant refused to accept the same, because, not having the advice of counsel, he apprehended the acceptance of the paper offered, might be regarded as an admission on his part, that the agreement was then of no effect.

Noble admits, that at the time referred to, in June, 1852, he refused to grant any extension of time under said agreement, as he was requested to do by the complainant, as he had before that sold and conveyed the lands described in the agreement to John B. Brown, and thereupon the complainant said he was ready to perform the conditions and stipulations of said agreement, but made no tender of notes, money or mortgage, and complained that he had not received a duplicate of the agreement, and threatened to bring a bill in equity against the defendant Noble, to compel a performance of the contract on his part. And immediately Noble offered to deliver a duplicate of the agreement, but the acceptance was refused.

Noble further admits, that on Sept. 17, 1852, the complainant, by one Woodbury, made a tender to him in Boston of the sum of $540, in gold, together with a note signed by himself for the sum of $1500, dated July 30, 1852, payable in three years from May 20, 1851, with interest, payable semi-annually, with a mortgage of said land described in the agreement, as security for said note, which defendant Noble declined to receive, or give a deed of said lands; and he be-

lieves that on Sept. 10, 1852, the complainant made a similar tender to F. A. Hall, the partner of the defendant in the coal and commission business in Boston; and that, on July 13, 1852, he made a like tender to William Willis, in Portland; and the defendant avers that neither Hall nor Willis had any authority to act for him in the premises; and that the complainant was informed and well knew that before making these offers or tenders, this defendant had declined to make any conveyance of said land to him, for the reasons set forth in his answer, which have been referred to. And that being desirous of disposing of all lands described in the agreement, he received proposals from John B. Brown, the other defendant, for the purchase of them and other lands, and by deed, dated April 30, 1852, he conveyed to said Brown all his title in and to the lands described in said agreement of May 20, 1851. And at the time of the negotiation with Brown, and ever after, he stated to him that he had been advised and verily believed that the complainant had no interest in the lands, and no claims whatever upon Noble, either in law or equity, but had wholly lost all interest in, and all right to the same.

Brown, the other defendant, answers, that long before the making and filing of the complainant's bill, he had bargained with Noble for the purchase and conveyance of the lots described in the bill, and in pursuance of the agreement between him and Noble, on the 20th day of April, 1852, Noble executed and delivered to him a deed, embracing said lots, of which the defendant Brown took possession under the deed, which makes a part of his answer, and he denies having combined or confederated with Noble, to deprive the complainant of the benefit of his alleged agreement with Noble, in relation to said lots of land. But on the contrary he states in his answer, that prior to making said purchase, he was informed by the defendant Noble, that the complainant had no right, title or interest in said lots of land, in law or in equity, and that Noble offered to show him certain old agreements and correspondence between him and this com-

plainant, and that he did not read the same, being told they were of no value or consequence.

The deed from Noble to Brown is a release of the grantor's right, title and interest, in the land described in the agreement, with other lands, for the consideration of $12000, with no covenants of any description.

Uriah H. Furlong deposes, that about Oct. 1, 1851, he inquired of the defendant Noble, if he owned the land, which the complainant formerly owned in Vaughan street; he answered that he did not; but had a claim on it. Upon being asked for what sum he would sell two of the lots referred to, said he could not sell them; if the complainant paid, it would fall to him; if he did not pay, the land would belong to him, and he had promised it to Mr. Brown; that Mr. Brown had the refusal of Mr. Gerrish's land, and had come to him to get the refusal of his; said he should sell it to Mr. Brown, if he sold it to any one; that he had agreed, if he held the land, to deed it to him.

The bill contains allegations which are denied in the answers, and are not supported by the requisite proof.

Allegations are also made in the answers, not responsive to the bill, and which are not proved by the proper evidence.

Other testimony is before us, which is not deemed very important under the aspect of the case as presented by the bill and answers, with other proofs of facts, not expressly alleged in the bill or denied in the answers. Some other evidence is relied upon, but it has but a remote bearing upon the questions involved, and is too loose and uncertain to be very satisfactory.

An important question presented in this case, is whether the agreement for the conveyance of the land, which was the subject matter of it, ever became a binding and effectual contract upon the defendant Noble.

The instrument was fully executed by both parties, and a duplicate also made and executed by the same. At the time of the execution, neither of these instruments was deliver-

ed to the complainant, because he had not fully paid the sum, which was the consideration of the delivery. To entitle him to the possession of one part of this contract, and the benefit thereof, it was necessary, that he should pay to the other party a certain sum. This sum he did pay within the time stipulated, at the place. of business of Noble, in his absence, to one who gave a receipt therefor, and which money Noble received. The only condition required of the complainant to make the agreement effectual was performed. In equity certainly, the contract was perfect, so far, that the agreement was the rightful property of him, as much as by a delivery of the instrument at the time of the execution. What was agreed to be done, on the payment of the sum of $43,33, must be treated as done, and the rights of each to be examined accordingly. No demand was required to be made after this by the complainant, for none was contemplated by the parties. The absence of Noble from the place where the contract was made, and to be delivered at the time the money was paid, imposed no new duty upon the complainant. The express agreement between them was, that the payment by the one party, and the delivery of the contract by the other, were to be simultaneous acts. The one was performed, and the obligation of Noble to perform the other remained entire, and it was his duty to transmit it immediately, on his having the opportunity, to the complainant.

But the omission to make the delivery by Noble did not change the rights of the complainant, and it was not treated by him, as having such effect. About Nov. 1, 1851, at the time he met the complainant in Portland, the meaning of Noble cannot be misunderstood, that he considered the written agreement as an effectual contract and binding upon him, when he said he had not the instrument with him, but it was ready for the complainant in Boston. And Noble does not in any act referred to in his answer, nor does he in the defence relied upon therein, insist, that the contract of May 20, 1851, was not regarded by him as having be-

come binding as perfectly as it would have been, by an actual and seasonable delivery; but it is insisted, that the same was forfeited, by the omission of the complainant to perform the conditions therein specified. The conduct of Noble, as disclosed in the deposition of Furlong, speaks the same language. He treated the rights of the complainant just as if they were, under the agreement, perfected in all respects.

It is insisted by the defendants, that notwithstanding the contract had, in the hands of Noble, all the effect which it might have had under the delivery to the complainant, that the latter has omitted the performance of the conditions, which were indispensable to entitle him to a conveyance of Noble's interest in the premises described. No attempt is made by the complainant to show that the money and the notes, secured by a mortgage which were the consideration of the conveyance, were offered until nearly the expiration of five months after the time fixed by the contract. Was he excused from doing this, under the facts disclosed in the bill, answer and proofs?

Lord HARDWICK says, "It is the business of the Court, to relieve against lapse of time in the performance of an agreement, and especially when the performance has not arisen by the default of the party seeking to have a specific performance." 1 Vesey, 450. Chancellor KENT says, in *Benedict* v. *Lynch*, 1 Johns. Ch. 370, "this is the true rule," and "that when the party who applies for specific performance, has omitted to execute his part of the contract, by the time appointed for that purpose, without being able to assign any sufficient justification, or excuse for his delay; and when there is nothing in the acts or conduct of the other party, that amounts to an acquiescence in that delay, the Court will not compel a specific performance. The rule is founded in the soundest principles of policy and justice." And again he says, "If, on the other hand, the circumstances of the case, and the conduct of the opposite party, will afford ground for a just inference, that he has

acquiesced in the delay, and waived the default, the non-performance at the stipulated time will be overlooked, and will be deemed to have been waived by the other party." And the cases *Seton* v. *Slade,* 7 Vesey, 265; *Smith* v. *Burnam,* 2 Anst. 527, and *Paine* v. *Meller,* 6 Vesey, 349, are relied upon, with others, which the Chancellor remarks, may be cited as turning upon the same distinction.

"Time is not generally deemed in equity to be of the essence of the contract, unless the parties have expressly so treated it, or it necessarily follows, from the nature and circumstances of the contract. It is true, that courts of equity have regard to time, so far, as it respects the good faith and diligence of the parties. But if circumstances of a reasonable nature have disabled the party from a strict compliance, the suit for specific performance is treated with indulgence, and generally with favor by the Court." And it is further said, that "he, who asks specific performance, is in a condition to perform his own part of the contract, and that he has shown himself ready, desirous, prompt and eager to perform the contract." Story's Eq. § 776.

In *Young & Collyer,* cited for the complainant, Mr. Baron ALDERSON says, "Now the first question is, whether time is of the essence of this agreement." "A court of equity must be governed by this principle. It is to examine the contract, not merely as a court of law does, to ascertain what the parties have in terms expressed to be the contract, but what is in truth the real intention of the parties, and to carry that into effect. In the ordinary case of the purchase of an estate, and fixing a particular day, for the completion of the title, the Court seem to have considered that the general object, being only the sale of the estate for a given sum, the particular day named is merely formal; and the stipulation means in truth, that the purchase shall be completed within a reasonable time, regard being had to all the circumstances of the case, and the nature of the title to be made." But it is further remarked, "If the thing sold is of greater or less value by the

effluxion of time, it is manifest, that time is of the essence of the contract, and the stipulations as to time must then be literally complied with in equity as well as in law."

This question was considered by this Court, in *Rogers* v. *Saunders*, 4 Shep. 92, and many authorities examined. And it was held therein, in accordance with well settled principles, that in the case put by Mr. Baron ALDERSON, of a sale of an estate, that time is not in such cases to be altogether disregarded, but to entitle him to relief, when time is not essential, the party asking it must show, that circumstances of a reasonable nature have prevented a strict compliance, or that it has been occasioned by the fault of the other party, or that a strict compliance has been waived.

With the principles which have been adverted to in view, has the complainant been wanting in that diligence in the performance of the conditions in the agreement, necessary to entitle him to a quitclaim deed, so that he has forfeited his right thereto ?

The contract of May 20, 1851, contained no agreement of the complainant, which the other party could enforce; or promise, for the breach of which damages could be recovered. It obligated Noble to make the stipulated conveyance of the land referred to therein, on the performance of the conditions by the complainant. A failure to do this without excuse, would be treated as an abandonment of the contract by him, and the land would continue the property of Noble, as it had been before.

No tender of the money or notes, which were to be the consideration of the conveyance, was made by the complainant to Noble, until a long time after the time agreed upon in the contract, and until the sale and conveyance to the defendant Brown. The excuse relied upon by the complainant is, the wrongful omission of Noble to give to him the duplicate agreement upon the receipt of the money, which was the only condition of delivery. The defendants insist that the possession of this evidence of the contract would

have been a matter of form only, and that it secured the same rights to the complainant while lying in the hands of one party, as it would have done if it had been in the possession of the other.

It is conceded by the complainant, that the withholding of the contract from him did not deprive him of the absolute rights which he had acquired under it. But it is denied that the defendants had the right to insist upon the literal fulfilment of the conditions when Noble retained exclusively the evidence of the agreement.

It is very clear that the want of the possession of the contract by the complainant, must almost necessarily be attended with uncertainty and inconvenience. It must have been known to the complainant, that no necessity existed to take a memorandum of every thing contained in the contract, when, as part of that very agreement, he was to have possession of a duplicate, which was executed by both parties, as soon as he paid a small sum, which was the condition of his right thereto and all its benefits. And it would have been unreasonable to suppose that under such circumstances he would recollect, several months afterwards, the date of the contract, the exact terms of the conditions in the same, and the time of performance, much less the description of every one of the numerous lots of land to be conveyed. It is quite apparent, from these considerations, that without the duplicate, the complainant would have been exposed to such errors as might work the forfeiture of his rights under the agreement.

But the possession of the written contract by the complainant, must be seen to have been very material to him. It was the instrument designed by the parties to it, to secure to him the whole benefit of his agreement, and the money expended in obtaining it. If it had consisted of one part only, its very nature was such, that to be effectual, without further proof, which is not shown to have existed in this case, it must have been in the hands of the complainant. It being in two parts, it was no less essential to him that he

should have one, and the necessity for the retention of both by Noble is not in the least apparent. It was in equity a conditional sale to the complainant of real estate. *Seton* v. *Slade*, 7 Vesey, 265.

The complainant had rights under the contract, which, without proof, he must be presumed to have regarded as important. He paid value for it, and took pains to obtain it. He treated it as one of value by going from Portland to Boston, and making payment of the sum required for its possession, within the time agreed. The defendants, too, by their negotiation with each other, touching the sale of this land by one, and the purchase by the other, as early as the fall of 1851, which negotiation resulted in the conveyance in April succeeding, the consideration of this deed, the omission of all covenants therein, may well be presumed to have regarded the contract as one of value.

In the absence of all evidence of the terms of the contract, or, in fact, of there being such a contract, excepting from the instrument itself, what were the means of this complainant of taking the steps which should result in the right to a quitclaim deed of the lands? Besides, the inconvenience and uncertainty, which have been adverted to, what rights could he have shown to the witnesses, upon whom he might call when he should proceed to make the tender of his money and his notes, and demand the deed? If he should have been met on the part of Noble with the same indifference to his rights, which had been manifested from the time of the payment, in Boston, to that moment, had he the assurance, which he could regard as a legal right, that his tender and demand would have been so heeded, that the duplicate contract would have been even at that late day, delivered to him? or that the deed, with the proper description of the land, would have been offered in its stead? He had, as we have seen from what has been disclosed in this case, the legal right, but in making the tender, on February 20, 1852, had he the ability of making that right manifest?

The contract, which the defendant Noble withheld from

the complainant, was constituted by the parties thereto, as the evidence of the agreement between them. It was deemed important to Noble that he should have possession of one part, and to the complainant, that he should have the other. And as well might the grantee in a deed after delivery, or the payee of a promissory note, after it became effectual, rest secure in the legal right of each, while the deed should be deposited in the hands of the grantor, unrecorded, or the note in the hands of the maker, as the complainant be protected fully in his rights, with the only contract in the hands of the one, by whom was to be done the material act, in execution of the purpose entertained by both. And in this case, the contract was held by Noble, in violation of the agreement with the complainant, and without his consent. It cannot be doubted that an obstacle has been thrown in the way of the complainant by the other party to the contract of May 20, 1851, which was sufficient to excuse the former from a strict fulfilment of the conditions in the agreement; that this was done by a breach of the contract, without the fault of the one now seeking to have a specific performance. The complainant cannot be treated as guilty of *laches*, in omitting to make the tender of the money and the notes at the time stipulated in the bond. It is true he might have gone to Boston after he had paid the money to Hall for Noble, and made demand of the contract. But he was under no obligation to do so. And when Noble must have known he expected it, it lies not with him to charge the other party with negligence. And there is nothing in this case showing that the complainant was not " ready, desirous, prompt and eager to perform the contract," if Noble had done what the law required of him.

But the complainant, according to the answer of Noble, which is responsive to an allegation in the bill, had the opportunity of possessing himself of the duplicate contract, in June, 1852, and could have made the tender of the money and note sooner than September 17, 1852, when it was

first made to Noble. At the time the contract was offered to the complainant, he was informed by Noble, that he had no rights under it, and that the conveyance would not be made to him; and at the same time, he was informed, that the right, title and interest in the lands had long before been conveyed to Brown, the other defendant, though the deed of conveyance appears to have been registered long afterwards.

The omission in the complainant, to make an earlier tender, could not have operated to the injury of Noble. It was refused, but not because it was not made immediately after the complainant had opportunity of knowing the terms of the contract, but on account of the alleged forfeiture of all his rights, under the agreement, and the inability of Noble to make the conveyance. The tender had only the effect, to show that the complainant had not abandoned his rights, but designed to protect them. This omission compromitted none of those rights as they existed, when the contract was offered.

The proofs, in relation to the taxes, which the complainant was to see discharged under the agreement, are not full or definite. What the taxes were, whether paid or not by Noble, does not distinctly appear. But the complainant was not bound to discharge the taxes while the contract was in the hands of Noble, more than to make payment of the money and deliver the note, which was the consideration of the conveyance. And whether the tender of the amount of taxes was added to the other amount, was quite immaterial. *Jones, in equity,* v. *Robbins,* 29 Maine, 351.

From the view, which we have taken of the matter, if the title had continued in Noble, he should be ordered to make conveyance of the land to the complainant according to the contract of May 20, 1851.

John B. Brown, the other defendant, negotiated with Noble for the purchase of the property a long time before he took the conveyance. Noble informed him, before the execution of the deed, or the purchase was made, that the complainant

had no right, title or interest in the land, and offered to show him agreements between himself and the complainant, to which Brown gave no heed.

The answer of Brown shows clearly, that he was apprised of a claim to the land made by the complainant. Noble did not deny this, but expressed his belief in its want of foundation. It is manifest, that he did not intend to incur any liability to Brown by a concealment of the facts within his knowledge, and gave him the means of knowing fully the relation in which he stood to the complainant, in reference to the land, that he might form his own judgment, aided by such counsel, as he might choose to call upon, judge of the validity of the claim of the complainant, and determine for himself, whether he was interfering unlawfully with that claim. It does not appear what agreements and correspondence was offered to Brown for his examination, and the Court is not informed whether the offer was of every thing appertaining to the subject; but if Noble knowingly withheld any thing material to that question, it was a fraud upon Brown, which, under the facts presented, is not to be inferred.

The depositions of Andrew Libbey and of Alvan Cushman represent that the complainant was in possession of a portion of the land described in his contract of May 20, 1851, at that time, had occupied the same for a long time previous, and continued to use and improve the same, till he was disturbed by Brown.

From the proof in the case, touching the question whether Brown had notice of the complainant's interest in the land, before his purchase, sufficient to charge him, the result cannot be doubtful. If he had not actual information of all the facts upon which the complainant's claim rested, he certainly was so admonished thereof, that he omitted inquiry, at his peril. "For whatever is sufficient to put a party upon inquiry, (that is, whatever has a reasonable certainty as to time, place, circumstances and persons,) is in equity, held to be good notice to bind him. Thus, notice of a lease,

is notice of its contents. So, if a person should purchase an estate from the owner, knowing it to be in the possession of tenants, he is bound to inquire into the estate, which these tenants have; and, therefore, he is affected with the notice of all the facts as to their estates." 1 Story's Eq. § 400.

" It is a rule in equity, that the possession of a tenant, is notice to a purchaser of the reversion, of the actual interest of the tenant, and of the whole extent of that interest, and he is bound to admit every claim which could be enforced against the vendor." *Chesterman* v. *Gardner*, 5 Johns. Ch. 29. This principle is supported by the case of *Daniels* v. *Davison*, 16 Vesey, 249, in which Lord Chancellor ELDEN says, " where there is a tenant in possession under a lease, or an agreement, a person purchasing part of the estate must be bound to inquire, on what terms that person is in possession."

The answer of Brown, and the proof adduced, bring him within the principle which has been referred to, and he must be treated as having had that notice which affects him as a purchaser of the estate, equally with Noble.

The complainant is entitled to a decree for specific performance, with costs.